## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TMX FINANCE LLC and TITLEMAX FUNDING, INC., | : | Civil No. 1:24-CV-02093 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| WENDY SPICHER, *in her official capacity as Secretary of the Pennsylvania Department of Banking and Securities*, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Plaintiffs and their affiliates filed this and other federal lawsuits throughout the country in an effort to enjoin a state civil enforcement action initiated by the Pennsylvania Department of Banking and Securities ("Department"). The Department accuses Plaintiffs and their affiliates of issuing usurious loans to Pennsylvania consumers in violation of Pennsylvania's statutory usury laws. Currently submitted for the court's consideration is the motion to dismiss submitted by Defendant, Wendy Spicher, the Secretary of the Department ("Defendant"). Defendant contends that this court must abstain from exercising jurisdiction over this matter pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny. For the reasons set forth herein, the *Younger* abstention doctrine necessitates this action's dismissal. Accordingly, the court will grant the Defendant's motion.

# BACKGROUND

This lawsuit is another episode in a years-long dispute between Plaintiffs and the Department over alleged usury. Plaintiff TMX Finance LLC is the parent company of Plaintiff TitleMax Funding, Inc. and certain "TitleMax entities" that offer loans secured by liens in borrowers' automobiles. (Doc. 1 ¶ 20; Compl. at 2, *TitleMax of Delaware, Inc. v. Spicher*, No. 1:24-CV-02224 (M.D. Pa. Aug. 13, 2024).) [1] These TitleMax entities include TitleMax of Ohio, Inc.; TitleMax of Delaware, Inc.; and TitleMax of Virginia, Inc. (collectively with TMX Finance LLC and TitleMax Funding, Inc., "TitleMax"). [2] None of these TitleMax companies are Pennsylvania entities. (*See* Doc. 1 ¶¶ 19, 22.)

## A. Pennsylvania's Usury Laws

Pennsylvania's Loan Interest and Protection Law ("LIPL") prohibits usury by setting a maximum permissible interest rate of six percent per annum on loans under $50,000. 41 Pa. Stat. § 201(a). Lenders licensed by the Department, however, may exceed that six-percent limit under certain circumstances, pursuant to Pennsylvania's Consumer Discount Company Act. *See* 7 Pa. Stat. §§ 6203(A), 6213. LIPL provides both a criminal and a civil penalty for violations of its

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

[2] CCFI Companies, LLC—a plaintiff in the related action *CCFI Companies, LLC v. Spicher*—is a subsidiary of TMX Finance's parent company. (Compl. at 6, *CCFI Cos., LLC v. Spicher*, No. 24-CV-02134 (M.D. Pa. Aug. 13, 2024).)

provisions.  A knowing and intentional violation subjects the offender to a misdemeanor of the third degree.  41 Pa. Stat. § 505(a).  Any violation of the statute subjects the offender to a $10,000 fine per offense.  *Id.* § 505(b).

### B. 2017 Subpoena and Associated Lawsuits

In August 2017, the Department began investigating TitleMax for possible violations of Pennsylvania's usury laws.  It did so by issuing a subpoena to TitleMax Funding's principal place of business ("2017 Subpoena").  (Doc. 1, ¶ 34; Doc. 16-4.)  In general, the 2017 Subpoena sought documents and records concerning loans that TitleMax entities made to Pennsylvania consumers.  (Doc. 16-4, pp. 5–7.)  TitleMax refused to comply with the 2017 Subpoena and, instead, filed a lawsuit in the United States District Court for the District of Delaware.  *See generally TitleMax of Delaware, Inc. v. Weissmann*, 505 F. Supp. 3d 353 (D. Del. 2020).  In that action, TitleMax argued that the Department's investigative subpoena was an attempt to extraterritorially enforce Pennsylvania's usury laws in violation of, *inter alia*, the Commerce Clause.  *Id.* at 354–55.  The district court found in favor of TitleMax and deemed the Department's actions unconstitutional.  *Id.* at 360.  The Third Circuit, however, reversed and determined that the Department's actions did not contravene the Commerce Clause's extraterritoriality principle, because TitleMax's actions did not wholly occur outside of

Pennsylvania. *TitleMax of Delaware, Inc. v. Weissmann*, 24 F.4th 230, 239–40 (3d Cir. 2022).

Concurrently with that federal lawsuit, the Department filed an enforcement action in Pennsylvania Commonwealth Court to compel TitleMax's response to some, but not all, of the 2017 Subpoena's requests. *See Pa. Dep't of Banking & Sec. v. TitleMax of Delaware, Inc.*, No. 417 M.D. 2017, slip op. at 5 (Pa. Commw. Ct. Feb. 22, 2023).[3]  Specifically, the Department sought the following information: (1) loan agreements and other agreements ancillary to loans between TitleMax and Pennsylvania consumers; (2) records relating to payments made by Pennsylvania consumers to TitleMax for loan or pawn obligations; and (3) records involving TitleMax's repossessions of vehicles owned by Pennsylvania consumers. *Id.* at 10–11.  Following the Third Circuit's decision, the Commonwealth Court found in favor of the Department and ordered TitleMax to respond to the applicable requests.  *Id.* at 23.  TitleMax produced a response in accordance with the Commonwealth Court's order.  (Doc. 1, ¶ 38.)

### C. 2024 Subpoena and the Department's Enforcement Proceeding

On June 7, 2024, the Department issued another subpoena to TitleMax ("2024 Subpoena").  (Doc. 1-1.)  The 2024 Subpoena included requests for the same information TitleMax provided in response to the 2017 Subpoena, but was

---

[3] This opinion is available at this case's docket number 25-2.

limited to the time period of "August 23, 2017 through the present." (*Id.* at 4.) TitleMax does not allege that the Department has sought court intervention to enforce the 2024 Subpoena.

One week later, the Department initiated a civil enforcement action ("Pennsylvania Proceeding") by issuing an order to show cause ("OSC") to TitleMax.[4] (*See* Doc. 1-2.) The OSC alleges that TitleMax charged interest rates in excess of the LIPL's six-percent limit, even though TitleMax was never licensed by the Department. (Doc. 1-2, p. 7.) The OSC accuses TitleMax of 5,270 violations of the LIPL between July 2008 and September 2017. (*Id.* at 7–8.) As sanctions for TitleMax's alleged conduct, the Department seeks a $10,000 fine for each of the alleged violations, for a total fine of $52,700,000. (*Id.* at 8.)

### D. TitleMax's Federal Lawsuits

TitleMax's answer to the OSC was initially due on July 15, 2024. (*See* Doc. 1-2, p. 2.) On August 13, 2024, following extensions to the due date, TitleMax filed six federal lawsuits in six different districts—the Northern District of Georgia, the Southern District of Ohio, the Western District of Virginia, the District of Delaware, the District of South Carolina, and the Northern District of

---

[4] The OSC lists the following entities as respondents: "TitleMax of Delaware, Inc.; TitleMax of Ohio, Inc.; TitleMax of Virginia, Inc.; TitleMax of South Carolina, Inc.; TitleMax Funding, Inc.; TMX Finance LLC; TMX Finance Corporate Services, Inc.; CCFI Companies, LLC; and all successors or predecessors in interest, affiliates, subsidiaries, or parent companies, however named." (Doc. 1-2, p. 2.)

Texas—rather than answer the OSC.  In each of the lawsuits, TitleMax alleges that the Department, through the OSC, is attempting to extraterritorially apply Pennsylvania's usury laws in violation of the Commerce Clause and the Due Process Clause.  (*E.g.*, Doc. 1, pp. 21–27.)  Moreover, TitleMax claims that the Department defectively served the 2024 Subpoena in violation of the Full Faith and Credit Clause and the Equal Protection Clause.  (*E.g.*, *id.* at  27–30.)  All of the lawsuits seek the same remedies: (1) a declaratory judgment that the 2024 Subpoena and OSC are unconstitutional; (2) a permanent injunction prohibiting the Department from enforcing the 2024 Subpoena; (3) a preliminary and permanent injunction enjoining the Department from enforcing the OSC and continuing the Pennsylvania Proceeding; and (4) a preliminary and permanent injunction enjoining the Department from initiating any action to enforce the 2024 Subpoena, to enforce the OSC, or to further regulate TitleMax.[5]  (*E.g.*, *id.* at 30–31.)

### 1.  TitleMax's Attempts to Stay Pennsylvania Proceeding

Each of the federal lawsuits have followed the same procedural path.  Once TitleMax filed its federal complaints, the Department extended the deadline to answer the OSC to October 14, 2024.  (Doc. 25, p. 6.)  Rather than immediately seek injunctive relief in federal court, TitleMax sought a stay in the Pennsylvania Proceeding.  (*See* Doc. 16-6.)  The chief hearing examiner of the Pennsylvania

---

[5] The Complaint also seeks reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Proceeding denied that request on September 20, 2024.  (*Id.* at 1.)  Five days later, TitleMax filed motions for preliminary injunction in each of the federal lawsuits in the hopes of enjoining the Department from enforcing the OSC and prosecuting the Pennsylvania Proceeding.  (*E.g.*, Doc. 16.)

On October 7, 2024, the chief hearing examiner of the Pennsylvania Proceeding granted TitleMax's motion to reconsider her refusal to grant a stay. (Doc. 29-1.)  Accordingly, the chief hearing examiner ordered a stay of the Pennsylvania Proceeding.  (*Id.*)  TitleMax thereafter requested a stay of its preliminary-injunction motions in the federal lawsuits.  (*E.g.*, Doc. 29.)

The stay of the Pennsylvania Proceeding, however, did not last long.  On appeal, the Department's Commission reversed the chief hearing examiner's stay and ordered TitleMax to respond to the OSC by December 15, 2024.  (Doc. 40-1.) Accordingly, TitleMax renewed its requests for a preliminary injunction, which are presently pending.  (Doc. 40.)  The current deadline for TitleMax to answer the OSC is January 30, 2025.

### 2. Defendant Files Motions to Dismiss and Motions to Change Venue.

While TitleMax was attempting to halt the Pennsylvania Proceeding, the Department was attempting to dismiss the federal lawsuits.  On October 7, 2024, Defendant filed motions to dismiss the complaints in each of the federal lawsuits. (*E.g.*, Doc. 24.)  These motions are currently pending, except for one.  The

Northern District of Texas, concluding that *Younger* abstention was required, granted the Defendant's motion to dismiss on December 5, 2024. *TMX Fin. Corp. Servs., Inc. v. Spicher*, No. 3:24-CV-2054-N, 2024 WL 4995580, at *1 (N.D. Tex. Dec. 5, 2024).

In late-October and early-November, the Department also filed motions to transfer venue to the Middle District of Pennsylvania. (*E.g.*, Doc. 35.) In turn, the Southern District of Georgia, the Southern District of Ohio, the District of Delaware, and the Western District of Virginia each granted Defendant's request to transfer venue.[6] Only the District of South Carolina has yet to rule on Defendant's venue-transfer motion.[7]

### 3.    Proceedings in the Middle District of Pennsylvania

Following transfer of TitleMax's cases to this court, TitleMax filed in each of the lawsuits a motion titled, "motion for judicial determination of non-waiver of personal jurisdiction defenses or, alternatively, motion to transfer venue." (*E.g.*, Doc. 53.) The motions ask the court to enter an order stating that TitleMax "may maintain this action and seek affirmative relief on their constitutional claims in this

---

[6] The above-captioned action was transferred from the Southern District of Georgia. *TitleMax of Virginia, Inc. v. Spicher*, No. 24-CV-02212, was transferred from the Western District of Virginia. *TitleMax of Delaware, Inc. v. Spicher*, No. 24-CV-02224, was transferred from the District of Delaware. Finally, *CCFI Companies, LLC v. Spicher*, No. 24-CV-02134, was transferred from the Southern District of Ohio.

[7] That case is docketed in the District of South Carolina as *TitleMax of South Carolina, Inc. v. Spicher*, 4:24-CV-04399.

Court without waiving their objection to personal jurisdiction over them in Pennsylvania or otherwise consenting to jurisdiction in the" Pennsylvania Proceeding. (*Id.* at 2.) Alternatively, the motions ask the court to transfer each case back to its original district court. (*Id.*)

The court's threshold task—before it can consider any of TitleMax's motions—is to resolve Defendant's motions to dismiss. The court has reviewed the Defendant's motion to dismiss and brief in support, Plaintiffs' brief in opposition, and Defendant's reply brief. (Docs. 24, 25, 31, & 37.) The court has also reviewed the same briefing filed in the other three TitleMax lawsuits pending before the court. The Department argues that the *Younger* abstention doctrine necessitates the dismissal of TitleMax's lawsuits.[8] The court agrees and, therefore, need not resolve TitleMax's pending motions.

## JURISDICTION

This case presents a dispute arising under the Constitution of the United States. Thus, subject matter jurisdiction is vested in this court pursuant to 28 U.S.C. § 1331. Venue is proper in this court under 28 U.S.C. § 1391(b).

---

[8] Defendant filed each of her motions to dismiss before the cases were transferred to the Middle District of Pennsylvania. Accordingly, each of her motions also argue for dismissal on personal-jurisdiction grounds. These arguments are moot now that the cases are before this court.

## STANDARD OF REVIEW

Motions to dismiss based on the *Younger* abstention doctrine are properly considered under Federal Rule of Civil Procedure 12(b)(6).[9]  *Heritage Farms, Inc. v. Solebury Twp.*, 671 F.2d 743, 745 (3d Cir. 1982).  In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Conclusory allegations of liability are insufficient" to survive a motion to dismiss.  *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79).  To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief."  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) *abrogated on other grounds as recognized in Mack v. Yost*, 968

---

[9] Defendant moves to dismiss on abstention grounds under Rule 12(b)(1) and Rule 12(b)(6). (Doc. 24, p. 1.)  The distinction is ultimately immaterial here, because no factual dispute exists for the purpose of Defendant's motion to dismiss.  *Carsten v. Boylan*, No. 3:17-CV-00733, 2018 WL 1696649, at *2 (M.D. Pa. Apr. 6, 2018).

F.3d 311, 319 n. 7 (3rd Cir. 2020).  In addition to the complaint and exhibits

attached thereto, the court may consider "matters of public record" and

"undisputably authentic document[s] that a defendant attaches as an exhibit to a

motion to dismiss if the plaintiff's claims are based on the document."  *Pension*

*Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.

1993).

## DISCUSSION

Federal courts are duty-bound to exercise the jurisdiction bestowed upon

them by Congress.  *See, e.g.*, *Colo. River Water Conservation Dist. v. United*

*States*, 424 U.S. 800, 817 (1976) (describing "the virtually unflagging obligations

of the federal courts to exercise the jurisdiction given them").  The federal

judiciary has "no more right to decline the exercise of jurisdiction which is given,

then to usurp that which is not given."  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S.

69, 77 (2013) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).

However, considerations arising from our federal system of government

have justified exceptions to the judiciary's "unflagging obligation" to exercise its

given jurisdiction.  As the Supreme Court acknowledged, "[s]ince the beginning of

this country's history Congress has, subject to few exceptions, manifested a desire

to permit state courts to try state cases free from interference from federal courts."

*Younger*, 401 U.S. at 43.

In *Younger*, the Supreme Court recognized the "far-from-novel" exception that federal courts must abstain from enjoining state criminal prosecutions, "absent bad faith, harassment, or a patently invalid statute." *Sprint*, 571 U.S. at 77 (citing *Younger*, 401 U.S. at 53–54.) Two foundational principles justify "this longstanding public policy against federal court interference with state court proceedings." *Younger*, 401 U.S. at 43. First, *Younger* abstention promotes "'comity,' that is, a proper respect for state functions." *Sprint*, 571 U.S. at 77 (quoting *Younger*, 401 U.S. at 44). The second principle is "the basic doctrine of equity jurisprudence that courts of equity should not act . . . to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.* (quoting *Younger*, 401 U.S. at 43–44.)

The *Younger* abstention doctrine has since been expanded to encompass state "civil enforcement proceedings" and "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 78 (quoting *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 368 (1989)); *accord Juidice v. Vail*, 430 U.S. 327, 335 (1977); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975).

To determine whether *Younger* abstention is appropriate here, the court must consider two sets of factors. First, the court must consider whether the

Pennsylvania Proceeding is "quasi-criminal" in nature, since only quasi-criminal civil enforcement proceedings can justify *Younger* abstention. *Sprint*, 571 U.S. at 81–82; *PDX N., Inc. v. Comm'r N.J. Dep't of Labor & Workforce Dev.*, 978 F.3d 871, 882–83 (3d Cir. 2020). Second, the court must determine whether the Pennsylvania Proceeding satisfies the three factors articulated in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982).

If the court determines that both sets of factors are satisfied, *Younger* abstention is required. The fate of TitleMax's lawsuits then would hinge on the type of relief sought. Courts abstaining under *Younger* must dismiss a lawsuit that seeks only injunctive or declaratory relief. *Borowski v. Kean Univ.*, 68 F.4th 844, 850 (3d Cir. 2023). Conversely, courts cannot dismiss a lawsuit if it includes a claim for damages, but may stay the damages claims for the pendency of the state proceeding. *Id.* Here, TitleMax seeks only injunctive and declaratory relief. (Doc. 1, pp. 30–31.) Thus, *Younger* abstention, if applicable here, would require the dismissal of TitleMax's lawsuits. *See Borowski*, 68 F.4th at 850.

### A. The Pennsylvania Proceeding is Quasi-Criminal in Nature.

The parties dispute whether the Pennsylvania Proceeding is a quasi-criminal proceeding. A proceeding is quasi-criminal if: (1) "the proceeding was initiated by a state in its sovereign capacity"; (2) "the proceeding sought to sanction the federal plaintiff for a violation of a legal right or duty"; and (3) "the proceeding has

another striking similarity with a criminal prosecution, such as by beginning with a preliminary investigation that culminates with the filing of formal charges or by the state's ability to sanction the federal plaintiff's conduct through a criminal prosecution." *Borowski*, 68 F.4th at 851; *accord Sprint*, 571 U.S. at 79–80; *Altice USA, Inc. v. N.J. Bd. of Pub. Utils.*, 26 F.4th 571, 576 (3d Cir. 2022); *PDX N.*, 978 F.3d at 882–83.

### 1. Pennsylvania initiated the Pennsylvania Proceeding in its sovereign capacity.

A state civil enforcement proceeding not initiated by a state in its sovereign capacity cannot be "quasi-criminal" for purposes of *Younger* abstention. *See Borowski*, 68 F.4th at 851. TitleMax contends this factor is not satisfied, because it was the Department's Compliance Office that initiated the Pennsylvania Proceeding, not the Commonwealth of Pennsylvania ("Commonwealth"). (Doc. 31, pp. 9–10.) This argument is wholly unpersuasive.

The Department is an administrative agency of the Commonwealth that acts under the direction of the Governor and has only the authority prescribed to it by statute. *Pa. Dep't of Banking & Sec. v. TitleMax of Delaware, Inc.*, No. 17-CV-02112, 2020 WL 127995, at *2–3 (M.D. Pa. Jan. 10, 2020). The Third Circuit has already implicitly recognized that the enforcement action concerning the 2017

Subpoena was commenced by the Department in a sovereign capacity.[10]  *See TitleMax of Delaware*, 24 F.4th at 236.  Indeed, a civil enforcement proceeding commenced by a state regulatory agency through a formal accusation of unlawful conduct is precisely the type of case contemplated by this factor.  *See Altice USA*, 26 F.4th at 576 (finding a state regulatory agency commenced an administrative action in its sovereign capacity when it filed a "formal complaint" in the form of a show cause order, pursuant to a state statute and implementing regulations).  It is unclear what state entity the Commonwealth would have to act through to satisfy this factor under TitleMax's theory, if not the Department.  Accordingly, the court finds that the Pennsylvania Proceeding was initiated by the Commonwealth in its sovereign capacity.

### 2.  The Pennsylvania Proceeding seeks to sanction TitleMax as retribution for an unlawful act.

The second factor considers whether the Pennsylvania Proceeding seeks to sanction TitleMax for unlawful conduct.  TitleMax presents two primary arguments concerning why the Pennsylvania Proceeding does not satisfy this factor.  First, TitleMax contends that the Pennsylvania Proceeding does not seek to sanction TitleMax, because the Department does not seek injunctive relief.  (Doc. 31, p. 10.)  This argument is easily dismissed.  There simply is no requirement that

---

[10] The Third Circuit ultimately found *Younger* abstention was unwarranted in that matter for other reasons.  *See TitleMax of Delaware, Inc.*, 24 F.4th at 230.

a civil enforcement proceeding seek injunctive relief to fall within the purview of *Younger* abstention.

Second, TitleMax contends that the Pennsylvania Proceeding merely seeks to incentivize TitleMax—through civil penalties—to comply with "a statute directed at commercial activity." (*Id.*)  It is true that civil penalties can be distinguishable from sanctions in certain contexts.  Indeed, "negative consequences are not the same thing as sanctions." *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 140 (3d Cir. 2014).  Sanctions are unique in that they "are retributive in nature and are typically imposed to punish the sanctioned party "for some wrongful act.'" *Id.* (quoting *Sprint*, 571 U.S. at 79).  A penalty imposed for violating a statutory or regulatory prohibition is clearly a "sanction." *See Altice USA*, 26 F.4th at 577–78; *PDX N.*, 978 F.3d at 883–84.  Conversely, penalties unrelated to unlawful or even wrongful conduct cannot be properly classified as sanctions. *ACRA Turf Club*, 748 F.3d at 140; *NCAA v. Corbett*, 25 F. Supp. 3d 557, 567 (M.D. Pa. 2014).

On this issue, TitleMax primarily relies on *ACRA Turf Club* and *NCAA v. Corbett*.  (Doc. 31, pp. 10–11.).  The facts of those cases, however, bear little resemblance to this one.  In neither of those cases did the federal plaintiff engage in unlawful or wrongful conduct.  Instead, those cases involved ordinary economic disputes.  In *ACRA Turf Club*, the federal plaintiff faced potential penalties for failing to open wagering facilities for which it had a state-issued permit to open,

unless it showed that it was making progress towards doing so. 748 F.3d at 129.

The Third Circuit held these possible negative consequences were clearly not

sanctions. *Id.* at 140. The failure to open wagering facilities was in no way

unlawful or wrongful conduct. *Id.* Rather than trying to punish such conduct, the

state was simply trying to incentivize the federal plaintiff to exercise its rights,

which the state thought would be economically beneficial. *Id.*

Similarly, *NCAA v. Corbett* involved a state proceeding seeking compliance

with "a state statute directed at commercial activity." 25 F. Supp. 3d at 567. In

that case, Pennsylvania State University ("Penn State") and the NCAA entered a

consent decree following investigations into an assistant football coach's sexual

abuse of children. *Id.* at 560. In the consent decree, Penn State agreed to pay $60

million over 5 years "into an endowment for programs to prevent child sexual

abuse" nationwide. *Id.* The Commonwealth later passed a statute that had the

effect of requiring all money paid by Penn State pursuant to the consent decree to

be deposited into an endowment for the benefit of Pennsylvania residents. *Id.* at

561. A state lawsuit was then initiated to force the NCAA to comply with the

Pennsylvania statute. *Id.* at 562. This court determined that the state lawsuit was

not intended to punish the NCAA. *Id.* at 566–67. The state lawsuit was merely

concerned with "economic control over the funds Penn State agreed to pay

pursuant to the consent decree" and, importantly, did not "implicat[e] a closely-associated state criminal statute." *Id.* at 566.

Unlike the federal plaintiffs in *ACRA Turf Club* and *NCAA v. Corbett*, TitleMax is accused of conduct that is undoubtedly unlawful and, in some instances, criminal. *See* 41 Pa. Stat. § 505(a). *ACRA Turf Club* and *NCAA v. Corbett* dealt with nothing of the sort. In relying on those cases, TitleMax erroneously frames the Department's attempt to prevent usury—conduct long-prohibited in our legal system[11]—as a simple economic dispute. It is clear that the Pennsylvania Proceeding is seeking a $52.7 million penalty as a sanction for alleged unlawful conduct. Accordingly, this factor is satisfied.

### 3. The Pennsylvania Proceeding is sufficiently similar to a criminal proceeding so as to justify *Younger* Abstention.

The third factor considers whether the Pennsylvania Proceeding "has another striking similarity with a criminal prosecution, such as by beginning with a preliminary investigation that culminates with the filing of formal charges" or the state having the ability to enforce a parallel criminal statute. *Borowski*, 68 F.4th at 851. Here, TitleMax disputes both (1) that the Pennsylvania Proceeding was preceded by an investigation and (2) that the Commonwealth could have enforced

---

[11] Pennsylvania's maximum annual interest rate of six-percent dates back to as early as 1700, and Massachusetts adopted the first American usury law in 1641. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1117–18 (2008).

a parallel criminal statute. (Doc. 31, pp. 10–11.) The court addresses each contention in turn.

On the first issue, TitleMax proffers an unconvincing contention that the complaint does not allege "any state actor conducted a formal investigation." (Doc. 31, p. 10). However, TitleMax acknowledges in its complaint that it received, and was ordered to respond to, the 2017 Subpoena. (*See* Doc. 1, ¶¶ 37–38). The 2017 Subpoena identifies itself as an "investigative subpoena" issued pursuant to a statute that empowers the Department to conduct investigations. (Doc. 16-4, p. 3); *see generally* 41 Pa. Stat. § 506(b) ("The department may examine any instrument, document, account, book, record, electronic data or file of any person, or make such other investigation as may be necessary to administer the provisions of this act."). This is precisely the type of pre-proceeding inquiry that has justified *Younger* abstention. *Cf. Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 624 (1986) (state actor notified respondent "it was conducting a preliminary investigation"); *PDX N.*, 978 F.3d at 883 (state actor conducted audits prior to administrative proceeding).

TitleMax further argues that some of its entities were not investigated at all, because they were unnamed in the 2017 Subpoena. (Doc. 31, p. 10.) Yet, TitleMax acknowledges that the 2017 Subpoena was broadly directed at TitleMax's businesses. (*See* Doc. 1, ¶ 34.) Indeed, TitleMax recognizes that the

Pennsylvania Commonwealth Court ordered all of the named respondents in the enforcement action to respond to the 2017 Subpoena, regardless of whether they appeared on the 2017 Subpoena's face.  (*See id.*, ¶¶ 35, 38); *see also TitleMax of Delaware*, No. 417 M.D. 2017, slip op. at 1 (ordering "TitleMax", defined as all "respondents," to respond to the 2017 Subpoena).  Whether a discrete legal entity or two that are part of a large conglomerate were not specifically named in an investigative subpoena generally directed at the conglomerate does not speak to the quasi-criminal nature of a proceeding brought against the conglomerate.  The fact is that the Department conducted an investigation of TitleMax before formally accusing many of its entities of unlawful conduct.  That imbues the Pennsylvania Proceeding with a quasi-criminal quality.

On the second issue, it is beyond doubt that Pennsylvania criminalizes usury. *TitleMax of Delaware*, 24 F.4th at 237 (citing 18 Pa. Stat. § 4806.3).  Nevertheless, TitleMax argues that the Commonwealth could not have enforced its criminal usury statutes here because TitleMax is not alleged in the OSC to have acted with the requisite *mens rea*.  (Doc. 31, p. 11.)  TitleMax's argument simply ignores the governing standard.  It is irrelevant whether TitleMax's conduct was "criminal or whether criminal charges are warranted" or "whether a criminal case against [TitleMax] would succeed."  *Altice USA*, 26 F.4th at 578 (quoting *PDX N.*, 978 F.3d at 884.)  The only question is whether a parallel criminal statute exists.  *Id.*

The answer is unquestionably yes.  *See* 18 Pa. Stat. § 4806.3 ("Whoever engages in criminal usury, or conspires to do so, is guilty of a felony . . . .")  Therefore, having found all three factors are satisfied, the court determines that the Pennsylvania Proceeding is a quasi-criminal proceeding for purposes of *Younger* abstention.

### B. *Middlesex* Factors

The court now must determine if the Pennsylvania Proceeding satisfies the three *Middlesex* factors.  The Pennsylvania Proceeding must (1) "be ongoing and judicial in nature"; (2) "implicate important state interests"; and (3) "afford [TitleMax] an adequate opportunity to raise [its] federal claims."  *Borowski*, 68 F.4th at 849; *accord Sprint*, 571 U.S. at 81; *Middlesex*, 457 U.S. at 432; *Altice USA*, 26 F.4th at 578.

### 1.  The Pennsylvania Proceeding is ongoing and judicial in nature.

A state proceeding is ongoing for the purposes of *Younger* abstention if it was pending at the time the federal plaintiff filed its federal complaint.  *PDX N.*, 978 F.3d at 885.  Here, the Department issued the OSC, which initiated the Pennsylvania Proceeding, before TitleMax filed its federal complaints.  *TMX Fin. Corp. Servs.*, 2024 WL 4995580, at *1.  Nevertheless, TitleMax advances several arguments as to why the proceeding is not "ongoing" for purposes of *Younger*.

First, TitleMax insists that courts determine whether a proceeding is ongoing by "look[ing] to the date the same constitutional claims pled in the federal

complaint were raised in the state proceeding." (Doc. 31, p. 13.) Since it has not raised its constitutional claims in the Pennsylvania Proceeding, TitleMax argues, there is no ongoing proceeding for the purposes of *Younger* abstention. (*Id.*) TitleMax's proposed standard makes little sense. The only case upon which TitleMax relies involved an attempt by federal plaintiffs' to invoke *Younger* after they raised counterclaims in a state proceeding, even though substantive proceedings had already occurred in federal court. *See Smith v. HSBC Bank USA, N.A.*, No. 2:15-CV-70, 2017 WL 3840273, at *3 (S.D. Ga. Sept. 1, 2017). The *Smith* court's refusal to abstain based on the federal plaintiffs' later-filed state claims was predicated on the principle that abstention doctrine should not reward procedural gamesmanship. *See id.*; *accord Swatt v. Hawbaker*, No. 4:21-CV-01025, 2022 WL 4453344, at *10 (M.D. Pa. Sept. 23, 2022) (explaining that abstention doctrine should not "reward a strategic gamesmanship that has no place in a dual system of federal and state courts"). TitleMax's proposed standard would reward just that. A policy of abstaining only when the party contesting abstention has taken certain affirmative actions in the state proceeding would support gamesmanship and ultimately vitiate *Younger*.

Second, TitleMax contends that the issuance of the OSC alone is insufficient to create an "ongoing" proceeding. (Doc. 31, p. 13.) To support this proposition, TitleMax relies on *Louisiana Debating & Literary Association v. City of New*

*Orleans*, 42 F.3d 1483 (5th Cir. 1995). TitleMax misconstrues the Fifth Circuit's ruling. In *Louisiana Debating*, "complaints" filed with a city commission would trigger an investigation conducted by the city commission "in order to make a probable cause determination." 42 F.3d at 1486. Only if the city commission found probable cause could it initiate an administrative proceeding. *Id.* The filing of complaints with the city commission was the only substantive administrative activity in *Louisiana Debating* by the time that federal lawsuit was pending; no investigation had occurred and no probable-cause determination was made. *Id.* at 1490.

The differences between *Louisiana Debating* and the present matter are readily apparent. By the time TitleMax filed its federal complaints, the Department had investigated TitleMax, made formal accusations of wrongdoing, and initiated the Pennsylvania Proceeding via the OSC. This case, in fact, is more similar to *Dayton Christian Schools* and *Middlesex*, cases the Fifth Circuit distinguished in *Louisiana Debating*. *Id.* ("Unlike the present action, the regulating agencies in those cases had investigated the allegations, made determinations that probable cause existed, and served formal charges on the entities.") (citing *Dayton Christian Schs.*, 477 U.S. at 623–624; *Middlesex*, 457 U.S. at 428).

Third, TitleMax contends that the Pennsylvania Proceeding is not ongoing because it was never properly initiated due to the Department's allegedly defective service of the OSC. (Doc. 31, pp. 12–13.) Yet, all of the TitleMax plaintiffs had actual notice of the Pennsylvania Proceeding—otherwise they could not have filed their complaints—and none of them were prejudiced, as evidenced by the fact that TitleMax's own actions in the Pennsylvania Proceeding has led to its response date being pushed back from July 15, 2024 to January 30, 2025. *Cf. McCreesh v. City of Phila.*, 888 A.2d 664, 666 (Pa. 2005) (noting that "initial procedurally defective service where the defendant has actual notice of the commencement of litigation and is not otherwise prejudiced" will not lead to "the draconian action of dismissing claims based on technical failings that do not prejudice the defendant"). Even if the Department's initial service of the OSC was technically defective, which this court is not deciding, TitleMax's subsequent actions fully support the determination that the Pennsylvania Proceeding is ongoing.

Finally, the Pennsylvania Proceeding bears all the hallmarks of a judicial proceeding. [12] "Proceedings may be judicial in nature if, for example, judicial review is available, they are initiated by a complaint, adjudicative in nature,

---

[12] Seemingly on this point, TitleMax argues that *Younger* abstention is unwarranted, because the injunctions it seeks are directed at Defendant, not a state judicial court. (Doc. 31, p. 14.) It is axiomatic that *Younger* applies to administrative civil enforcement proceedings, not just court proceedings. *See Sprint*, 571 U.S. at 79–80.

governed by court rules or rules of procedure, or employ legal burdens of proof."
*Altice USA*, 26 F.4th at 579 (internal quotation marks omitted) (quoting *Kendall v. Russell*, 572 F.3d 126, 131 (3d Cir. 2009)).  The Pennsylvania Proceeding was initiated by a formal pleading, the OSC.  (*See* Doc. 1-2.)  TitleMax has a right to challenge the OSC's allegations.  (*Id.* at 2.)  The Pennsylvania Proceeding is governed by a comprehensive set of rules, Pennsylvania's General Rules of Administrative Practice and Procedure.  (*Id.* at 3 (citing 1 Pa. Code. §§ 31.1–35.251).)  Finally, as discussed more fully below, judicial review is available to TitleMax.  2 Pa. Cons. Stat. § 702.  Thus, the court concludes that the first *Middlesex* factor is satisfied.

### 2. The Pennsylvania Proceeding implicates important state interests.

The second *Middlesex* factor asks whether the state proceeding implicates an important state interest.  The Third Circuit has already stated in this exact context that "Pennsylvania has a strong interest in prohibiting usury" and that "[a]pplying Pennsylvania's usury laws to TitleMax's loans furthers that interest."  *TitleMax of Delaware*, 24 F.4th at 241.  Notwithstanding this Third Circuit precedent, TitleMax contends that Pennsylvania has no interest in regulating loans that originated in other states and that federal interests in this matter supersede Pennsylvania's interests.  (Doc. 31, pp. 14–15.)  These arguments speak to the merits of TitleMax's underlying claims.  This factor, however, contemplates "the

importance of the generic proceeding to the State," not the narrow "interest in the outcome of the particular case." *NOPSI*, 491 U.S. at 365; *accord PDX N.*, 98 F.3d at 885 (rejecting argument that "federal preemption supersedes any state interest to the contrary" because courts do not consider the merits when analyzing the second *Middlesex* factor). TitleMax's argument, therefore, is unpersuasive. Accordingly, the second *Middlesex* factor is satisfied.

### 3. The Pennsylvania Proceeding affords TitleMax an adequate opportunity to raise its federal claims.

The final *Middlesex* factor considers whether the state proceeding affords the federal plaintiff an adequate opportunity to raise its federal claims. As a threshold matter, TitleMax bears the burden of establishing that Pennsylvania procedure fails in this regard. *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987); *Schall v. Joyce*, 885 F.2d 101, 107 (3d Cir. 1989); *see Baker v. Reitz*, No. 3:18-CV-2330, 2018 WL 6574782, at *3 (M.D. Pa. Dec. 13, 2018) (quoting *Kelm v. Hyatt*, 44 F.3d 415, 420 (6th Cir. 1995) ("Initially, we must presume that the state courts are able to protect the interests of the federal court.").

TitleMax first argues that it cannot raise its federal claims in the Pennsylvania Proceeding, because Pennsylvania's General Rules of Administrative Practice and Procedure preclude the filing of and rulings on motions to dismiss. (Doc. 31, p. 15.) The court disagrees that the Pennsylvania rules definitively foreclose motions to dismiss or the resolution of them. Instead, they seemingly

permit them, *see* 1 Pa. Code § 35.178 ("Motions may be made in writing at any

time . . . ."), and allow for rulings on them before any hearing occurs.  1 Pa. Code.

§ 35.180(a).  Moreover, TitleMax's failure to even attempt to file a motion to

dismiss in the Pennsylvania Proceeding reveals that its argument is really based on

an assumption that Pennsylvania rules will not permit presentation of its federal

claims.  Such an assumption is improper.  *See Pennzoil*, 481 U.S. at 15 ("We

cannot assume that state judges will interpret ambiguities in state procedural law to

bar presentation of federal claims.").  In fact, "when a litigant has not attempted to

present his federal claims in related state-court proceedings, a federal court should

assume that state procedures will afford an adequate remedy, in the absence of

unambiguous authority to the contrary."  *Pennzoil*, 481 U.S. at 15.  Since no such

contrary authority has been identified, TitleMax's argument fails.

TitleMax further argues that it cannot present its constitutional claims in the

Pennsylvania Proceeding, because the Department has no authority to rule on the

constitutionality of the laws it enforces.  (Doc. 31, p.  16.)  Even accepting this

proposition, *arguendo*, TitleMax's argument would still fail.  The third *Middlesex*

factor is satisfied when federal plaintiffs have the opportunity to raise federal

claims during judicial review of administrative proceedings.  *Dayton Christian*

*Sch.*, 477 U.S. at 629 ("[I]t is sufficient under *Middlesex* . . .  that constitutional

claims may be raised in state-court judicial review of the administrative

proceeding."); *PDX N.*, 978 F.3d at 885 (holding that third *Middlesex* factor is satisfied when federal plaintiff could reserve constitutional questions "for the judicial review process, after the administrative process is complete.").

TitleMax resists the application of this principle by arguing it has no right to seek judicial review of the Pennsylvania Proceeding because it is not registered to do business in Pennsylvania.  (Doc. 31, p. 16.)  The statute on which TitleMax relies states, "[a] foreign filing association or foreign limited liability partnership doing business in this Commonwealth may not maintain an action or proceeding in this Commonwealth unless it is registered to do business under this chapter."  15 Pa. Con. Stat. § 411(b).  This statute plainly does not prevent TitleMax from seeking judicial review.  First, the statute only applies to entities "doing business in this Commonwealth."  *Id.*  TitleMax's entire Commerce Clause claim is premised on its insistence that it does *not* do business in Pennsylvania.  Additionally, the statute's commentary states that the statute's prohibition does not extend to entities defending an action or proceeding, *i.e.*, not seeking affirmative relief.  *Id.* cmt. Therefore, in this context, Section 411(b) does not conflict with the statute granting "[a]ny person aggrieved by an adjudication of a Commonwealth agency who has a direct interest in such adjudication . . . the right to appeal therefrom to the court vested with jurisdiction of such appeals."  2 Pa. Con. Stat. § 702.  This opportunity

for judicial review provides TitleMax with an adequate opportunity to raise its federal claims.

TitleMax has failed to satisfy its burden on this issue. Thus, the court concludes that the third *Middlesex* factor is satisfied.

### C. None of the *Younger* Exceptions Apply.

Having determined that the Pennsylvania Proceeding satisfies all three *Middlesex* factors, the court next considers whether any exception to *Younger* is applicable. Avoiding otherwise-warranted *Younger* abstention is only justified in "exceptional circumstances" such as "where irreparable injury is both immediate and great, where the state law is flagrantly and patently violative of express constitutional prohibitions, or where there is a showing of bad faith, harassment, or . . . other unusual circumstances that would call for equitable relief." *Mitchum v. Foster*, 407 U.S. 225, 230 (1972) (internal quotation marks and citations omitted). Additionally, *Younger* abstention is unwarranted when a federal plaintiff seeks relief that is "wholly prospective" and not "designed to annul the results of a state [proceeding]." *Wooley v. Maynard*, 430 U.S. 705, 711 (1977). These exceptions are "narrowly construed." *Velasquez v. Litz*, No. 3:21-CV-1658, 2021 WL 5298910, at *1 (M.D. Pa. Nov. 13, 2021). TitleMax, as the party seeking to avoid *Younger* abstention, bears the burden of establishing the applicability of an

exception.  *G.S. ex rel. F.S. v. Rose Tree Media Sch. Dist.*, 393 F. Supp. 3d 420, 427 (E.D. Pa. 2019).

> ### 1. TitleMax faces no irreparable injury, let alone one that is great and immediate.

TitleMax contends that the Pennsylvania Proceeding will cause it to suffer irreparable injury that is great and immediate.  (Doc. 31, p. 18.)  The only injury TitleMax identifies is alleged violations of constitutional rights.  (*Id.*)  The court is unconvinced that TitleMax's "constitutional rights will be irreparably harmed," since it is perfectly capable of "rais[ing] constitutional challenges in the [Pennsylvania] Proceeding."  *TMX Fin. Corp Servs.*, 2024 WL 4995580, at *3.  TitleMax's argument is also conceptually unsound.  Under TitleMax's theory, *Younger* abstention would be inappropriate anytime a federal plaintiff raised constitutional challenges, even if those challenges could be raised in the state proceeding.  Broadening the scope of this exception to include the present circumstances would, thus, create an exception that swallows the rule.  Accordingly, TitleMax fails to establish that it faces a great and immediate irreparable injury.

### 2. No bad faith, harassment, or unusual circumstances justify exercising jurisdiction.

TitleMax presents three additional arguments as to why this court should decline *Younger* abstention here. None of these arguments are availing.

First, TitleMax insists that the Department brought the Pennsylvania Proceeding in bad faith. (Doc. 31, p. 18.) A proceeding is conducted in bad faith only when it is brought "without hope" of success. *Getson v. New Jersey*, 352 F. App'x 749, 753 (3d Cir. 2009) (quoting *Perez v. Ledesma*, 401 U.S. 82, 85 (1971)). Instances in which this exception applies are exceedingly rare. *See* 17B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4255 (3d ed. 2024) ("There is no case since *Younger* was decided in which the [Supreme] Court has found that the exception for bad faith or harassment was applicable."). TitleMax believes that the Pennsylvania Proceeding has no hope of success against certain TitleMax entities because those entities never actually made loans. (Doc. 31, p. 18.) Beyond this merits-based argument, TitleMax points to no other indicia of bad faith, such as retaliatory motive or an intent "to discourage [TitleMax] from exercising [its] constitutional rights." *Getson*, 352 F. App'x at 754. The court agrees with the Northern District of Texas's conclusion that TitleMax's merits-based argument alone "does not convincingly establish any bad faith." *TMX Fin. Corp. Servs.*, 2024 WL 4995580, at *3.

Second, TitleMax argues that the Department's pecuniary interest in the outcome of the Pennsylvania Proceeding renders it impermissibly biased. (Doc. 31, pp. 18–19.) *Younger* abstention is inappropriate when state authorities have such a pecuniary interest in the outcome of the case that it would render them "unconstitutionally disqualified" from hearing the case. *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973). An insubstantial pecuniary interest is not enough to defeat *Younger* abstention. *See All Am. Check Cashing, Inc. v. Corley*, 191 F. Supp 3d. 646, 664 (S.D. Miss. 2016). Rather, to satisfy its burden, the party claiming bias must show: (1) that the agency's "enforcement activities constitute a material source of [the agency's] funding" such that it could affect the agency's impartiality; and (2) "the agency has control over how the[] funds are spent." *Id.* (collecting cases).

Nothing in TitleMax's complaints or briefs suggests that these factors are present here. TitleMax merely points to a discrete statement on the Department's website that states, "[o]ur work is funded entirely by the assessments and fees paid by Pennsylvania's regulated and licensed financial community. No taxpayer dollars are used to support our work."[13] This is plainly insufficient to carry TitleMax's burden. *See id.*

---

[13] About DoBS, Commonwealth of Pennsylvania, https://www.pa.gov/agencies/dobs/about.html (last visited January 16, 2025).

Finally, TitleMax argues that the Pennsylvania Proceeding is impermissibly biased because Defendant is a member of the Department's Commission, which has appellate authority over hearing officers' decisions. (Doc. 31, p. 18.) TitleMax fails to cite any authority that this alone is sufficient to trigger an exception to *Younger*. In fact, Defendant previously recused herself when the Department's Commission reversed the chief hearing examiner's decision to stay the Pennsylvania Proceeding, Doc. 42-1, p. 3., and she has expressed an intention to recuse herself in future TitleMax-related matters. (Doc. 37, p. 11 n.8.) The Defendant's mere membership on the Department's Commission does not present "unusual circumstances" that necessitates the disregard of *Younger* abstention. *TMX Fin. Corp. Servs., Inc.*, 2024 WL 4995580, at *3.

### 3. TitleMax does not seek "wholly prospective" relief.

As noted above, TitleMax seeks not only to enjoin the Department from prosecuting the Pennsylvania Proceeding but also from further regulating TitleMax, which includes initiating future administrative proceedings. (Doc. 1, p. 31; Doc. 31, pp. 7–8.) TitleMax claims that the request to enjoin the Department from initiating future administrative proceedings falls outside the scope of *Younger* abstention, because the "relief sought is wholly prospective." (Doc. 31, p. 7.)

In support of its position, TitleMax cites *Wooley* and *Singleton v. Taylor*, No. 2:20-CV-99-WKW, 2021 WL 3862001 (M.D. Ala. Aug. 25, 2021). These

cases, however, are distinguishable. In *Wooley*, there were no pending state

proceedings, thus a federal ruling would not in any way have interfered with a

pending or completed state proceeding. 430 U.S. at 711. In *Singleton*, the federal

plaintiffs did not seek *any* injunctive relief against pending state court cases.

*Singleton*, 2021 WL 3862001, at *3. Unlike those cases, TitleMax seeks

declaratory and injunctive relief regarding a currently pending state administrative

proceeding. (Doc. 1, pp. 30–31.) Indeed, the purpose of TitleMax's singular

request for prospective relief cannot be separated from the purpose of its

requesting present relief or the overall purpose of TitleMax's lawsuits, *i.e.*, to

interfere with the Pennsylvania Proceeding. In this way, the relief that TitleMax

seeks cannot be considered "wholly prospective." *Cf. Coyle v. Pennsylvania*, No.

23-CV-1618, 2023 WL 3594146, at *4 (E.D. Pa. May 22, 2023) (finding that the

federal plaintiff's lawsuit to enjoin enforcement of a bail condition imposed in

state prosecution did not seek "wholly prospective" relief, even though he had not

yet been charged with violating the bail condition, because the relief was related to

a currently pending case); *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156,

166–67 (4th Cir. 2008) (Federal plaintiff's lawsuit was attempt to annul outcome

of state administrative proceeding and, thus, did not seek "wholly prospective

relief."). The *Wooley* exception contemplates a case in which there would be no

interference with pending state proceedings. *See* 430 U.S. at 711. Since the relief

sought by TitleMax's presents a significant potential for such interference here, the court finds that *Wooley* is inapplicable.  Having determined that no *Younger* exception applies, the court will abstain.

### D. TitleMax's Claims Concerning the 2024 Subpoena are Not Ripe.

Finally, the court considers TitleMax's claims for declaratory and injunctive relief concerning the 2024 Subpoena.  TitleMax argues that *Younger* abstention cannot apply to these claims, because the 2024 Subpoena is not a "civil enforcement proceeding."  (Doc. 31, p. 7.)  These claims, however, present a threshold ripeness issue.

Courts employ the doctrine of ripeness, among others, to ensure they exercise their judicial power only over "cases" and "controversies," as required by Article III of the United States Constitution.  *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 538–39 (3d Cir. 2017) (quoting U.S. Const. art. III, § 2).  Ripeness doctrine primarily "serves to determine whether a party has brought an action prematurely."  *Siemens USA Holdings, Inc. v. Geisenberger*, 17 F.4th 393, 412 (3d Cir. 2021) (quoting *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004)).  Claims are not ripe if they "depend[] on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

TitleMax's claims challenging the 2024 Subpoena are based on speculative injuries that depend entirely on a contingency:  the Department initiating an enforcement action in Pennsylvania courts.  The 2024 Subpoena is a non-self-executing subpoena, which is to say the Department has no authority to sanction a party for failing to comply with it.  *See* 7 Pa. Stat. § 6212.  Instead, when someone fails to comply with a subpoena issued by the Department, "the Secretary of Banking may invoke the aid of the courts, and such court shall thereupon issue an order requiring the person subpoenaed to obey the subpoena."  *Id.*  Only after someone has failed to comply with the court order can the contemptuous party be sanctioned.  *See id.* ("Any failure to obey such order of the court may be punished by such court as a contempt thereof.").  Therefore, the mere issuance of the 2024 Subpoena does not cause TitleMax any injury.  *See, e.g.*, *Wearly v. FTC*, 616 F.2d 662, 667 (3d Cir. 1980) (finding issuance of non-self-executing subpoena alone did not place subpoenaed party "on the horns of a dilemma . . . to either turn over the documents . . . or suffer civil or criminal penalties as a result"); *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 23-CV-23076, 2024 WL 150096, at *4 (D.N.J. Jan. 12, 2024) (explaining that alleged injury resulting from issuance of non-self-executing subpoena was merely contingent on future enforcement proceedings).

Here, TitleMax does not allege that the Department has sought any court intervention to enforce the 2024 Subpoena.  Courts have generally found similar pre-enforcement challenges to non-self-executing state administrative subpoenas to be not ripe.  *See, e.g.*, *Google, Inc. v. Hood*, 822 F.3d 212, 224–26 (5th Cir. 2016) (finding Google's challenge to subpoena issued by the Mississippi Attorney General's Office was not ripe when that office had no authority to enforce the subpoena and had not to that point initiated an enforcement proceeding); *First Choice Women's Res. Ctrs.*, 2024 WL 150096, at *3–4 (holding challenge to subpoena issued by New Jersey's Attorney General's Office was premature when the subpoena was only enforceable via court intervention and no such intervention had been sought); *see also, e.g.*, *Reisman v. Caplin*, 375 U.S. 440, 443–44 (1964) (finding no jurisdiction over pre-enforcement challenge to IRS investigative subpoena); *Wearly*, 616 F.2d at 665 ("Resort to a court by recipients of investigative subpoenas before an action for enforcement has commenced is generally disfavored").  The court finds these authorities persuasive.

Whether TitleMax will be subject to injury is entirely contingent on the Department initiating future enforcement proceedings, which the Department may or may not pursue.  Under these circumstances, the court is convinced that TitleMax's challenge to the 2024 Subpoena is not ripe.  The court therefore will dismiss these claims without deciding whether *Younger* abstention applies to them.

### E. Issue Preclusion

Finally, the court acknowledges that it ordered supplemental letter briefing on whether the Northern District of Texas's dismissal of TitleMax's case implicated the doctrine of issue preclusion. The parties submitted letter briefs on this issue, Docs. 52, 56, & 64, and the court has carefully considered the parties' arguments. The court has independently determined that *Younger* abstention is necessary here, and application of issue preclusion would lead to the same result. Accordingly, it is unnecessary for the court to reach this issue.

CONCLUSION

The court determines that *Younger* abstention necessitates the dismissal of TitleMax's lawsuits. Accordingly, the court will grant Defendant's motions to dismiss and deny as moot all other pending motions in each of TitleMax's cases pending before this court. An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: January 16, 2025